**EXHIBIT 1**

# In The Matter Of:

*Jamie Douglas   v.*
*Schweiss Distributing, Inc., et al*

---

*Donald Geib*
*March 11, 2003*

---

*Brusilow & Associates*
*1926 Arch Street*
*1st Floor West*
*Philadelphia, PA   19103-1404*
*(215) 977-9700     FAX: (215) 977-9773*

Original File GEIB0311.V1, 89 Pages
Min-U-Script® File ID: 3274504234

# Word Index included with this Min-U-Script®

Page 22

[1] spools around the drum?

[2] A: Uh huh.

[3] Q: Is that yes?

[4] A: I did. Sorry. Yes.

[5] Q: And was this on the left hand door or

[6] the right hand door?

[7] A: Like I said, I only remember looking

[8] at the left hand door.

[9] Q: All right.

[10] A: And there was guards on them.

[11] Q: We have three types of guards on the

[12] tables here in front of us, Exhibits A, B and C.

[13] That have been marked previously.

[14] Do any of these three look

[15] similar to the shields that you saw in September of

[16] 1997?

[17] A: No.

[18] Q: How do these differ from the ones you

[19] saw or if you can describe for me what the ones

[20] looked like that you saw?

[21] A: The cables I replaced was just a

[22] floating guard with a nipple or whatever you would

[23] call this piece of pipe coming down through the

[24] top.

Page 23

[1] MR. DEVLIN: Indicating

[2] the brown pipe that the cable

[3] goes through.

[4] THE WITNESS: That the

[5] pipe projected up through that

[6] guard, and the cable runs

[7] through it. There was no

[8] sleeve, would be the difference.

[9] BY MR. POPILOCK:

[10] Q: If we look at Exhibit A, for example,

[11] the angle iron on the outside looks similar?

[12] A: Yes

[13] Q: The pipe that sticks through the

[14] angle iron, that would accept the cable looks

[15] similar?

[16] A: But it was welded just into the sheet

[17] metal

[18] Q: It was welded to the actual angle

[19] iron itself?

[20] A: Yes

[21] Q: And then if we turn it over on the

[22] underside your testimony today is that there was

[23] no collar or welding on the inside?

[24] A: That was flush, this pipe or nipple

Page 24

[1] was in a flush situation with the inside of that

[2] guard.

[3] MR. DEVLIN: Meaning

[4] with the angle iron?

[5] THE WITNESS: This

[6] angle with this angle. There

[7] would be no projection to the

[8] pipe down to that.

[9] BY MR. POPILOCK:

[10] Q: The pipe wasn't projecting farther

[11] past the angle iron at all on the inside?

[12] A: No. It was just that it could ride

[13] on top of the angle drum.

[14] Q: And was that true for each of the

[15] three cables on the left door?

[16] A: Yes, because I remember lifting them

[17] up, and once I took the cables off at the header, I

[18] could thread it right through and take them off.

[19] Q: Do you recall whether these guards

[20] were painted any color?

[21] A: I just remember it being just regular

[22] metal. I don't remember any colors on them.

[23] Q: Did it appear to you that at one

[24] point there was a collar or some device on the

Page 25

[1] inside that may have been taken off, or was it

[2] flush on the inside? Or couldn't you tell?

[3] MR. DEVLIN: Objection

[4] form of the question.

[5] THE WITNESS: I had no

[6] reason to look at it, so I don't

[7] know. I never examined it.

[8] whether there was a situation

[9] I would think that

[10] something was cut off, then I

[11] would have seen it pretty

[12] readily when I had them off.

[13] But it did not have any collar

[14] on them. That I can say for a

[15] definite fact.

[16] BY MR. POPILOCK:

[17] Q: Did you have any discussions with

[18] Mr. O'Brien on this visit about these guards?

[19] A: No

[20] Q: Did you have any discussion with

[21] Mr. O'Brien about the fact that the cables were

[22] fraying and needed replacement or what might have

[23] been causing that?

[24] MR. DEVLIN: I have an

Jamie Douglas v.
Schweiss Distributing, Inc., et al
March 11, 2003
Case 2:02-cv-04556-WY   Document 26-2   Filed 06/23/2003   Page 4 of 46

Page 26

[1] objection. He said he only saw
[2] a couple of trays sticking out
[3] on a cable.
[4]     Go ahead, sir. You can
[5] answer.
[6]     THE WITNESS: Did you
[7] have a question? Sorry.
[8]     BY MR. POPILOCK:
[9]     Q: Did you see fraying on more than one
[10] cable?
[11]     A: Not that I recall. I mean, when I
[12] seen that and he said he wanted the cables
[13] replaced, I mean, we just went ahead and did the
[14] job he requested. And that was pretty much it.
[15]     Q: Did you have any discussion with
[16] Mr. O'Brien as to what might have been causing the
[17] fraying of this cable?
[18]     A: No, because I have seen cables fray
[19] on sectional doors. I mean, this is just — they
[20] break down sometimes. I never — it didn't seem to
[21] alarming to me.
[22]     Q: Now, when you operated the door did
[23] you observe how this guard would move as the door
[24] would open or close?

Page 27

[1]     A: Yes.
[2]     Q: And what would the guard do when the
[3] door was opening?
[4]     A: Well with that cable coming down
[5] through the pipe, it just rode across the drum at
[6] the speed that that cable revolves around that
[7] drum, as it winds it up.
[8]     MR. ABELL: The witness
[9] is gesturing with his hand from
[10] side to side.
[11]     BY MR. POPILOCK:
[12]     Q: So the underside of the angle iron
[13] would ride on the cable as it wound around the
[14] drum?
[15]     A: Yes.
[16]     Q: Is that right?
[17]     A: Yes. And you have — if you have a
[18] picture of that drum — the cable built up the drum
[19] a little, really so this was just resting right
[20] across that flat surface.
[21]     Q: Did that appear to impede the ability
[22] of the cable to wind?
[23]     A: No. There is not much weight, that
[24] that little thing on there, it sure don't affect

Page 28

[1] that.
[2]     Q: In September of 1997 did you have an
[3] understanding as to what the purpose of that angle
[4] iron was?
[5]     A: Yes.
[6]     Q: And what was your understanding?
[7]     A: It protects something from getting
[8] caught in the cable as it wraps around the drum.
[9]     Q: Did you understand that it was to
[10] protect also someone's hands from getting in there?
[11]     A: Well, I am sure it did enter my mind.
[12] But, yeah, that would be common sense. Anything
[13] that would get in there, you could not get wrapped
[14] around that drum between the drum and the cable.
[15]     Q: So at least in September of 1997, you
[16] understood that shield to be a safety shield?
[17]     A: Yes.
[18]     Q: Did you have any discussion with
[19] Mr. O'Brien about the manner in which the shield
[20] rode on that cable?
[21]     A: No. I mean, it was just — I thought
[22] that was the design of the door. That never
[23] entered my mind that there would be any sleeve that
[24] should be there or anything.

Page 29

[1]     Q: Did you have any discussions with
[2] Mr. O'Brien about replacing the shields or getting
[3] a different type of safety guard?
[4]     A: No because I never knew — I would
[5] never think anything would be available other than
[6] what was on. I thought that was it.
[7]     Q: Now, when you replaced the three
[8] cables on the left-hand door, did you also replace
[9] the shield?
[10]     A: Yes.
[11]     Q: So when you left the plant in
[12] September of 1997, after performing your work, to
[13] your knowledge, the left-hand door had all three
[14] shields in place?
[15]     A: Yes.
[16]     Q: Let me see if we have that work
[17] order. I think I have marked that as Resch-1.
[18] Here it is. I am going to show you what's been
[19] previously marked as Resch Exhibit 1.
[20]     Tell me if that is the
[21] document that represents the invoice for the work
[22] you performed on that occasion.
[23]     A: Yes. That's my writing down in the
[24] left-hand corner, and that's stating what I did

# In The Matter Of:

*Jamie Douglas   v.*
*Schweiss Distributing, Inc., et al*

---

*William Resch*
*March 11, 2003*

---

*Brusilow & Associates*
*1926 Arch Street*
*1st Floor West*
*Philadelphia, PA   19103-1404*
*(215) 977-9700     FAX: (215) 977-9773*

Original File RESCO311.V1, 135 Pages
Min-U-Script® File ID: 0503589198

# Word Index included with this Min-U-Script®

Page 54

[1]    MR. ABELL: Could I ask

[2] you to sharpen that question

[3] whether they are similar or

[4] whether they are identical?

[5]            BY MR. POPILOCK:

[6]    Q: Do they look the same? Do they look

[7] different? Do they look similar?

[8]            MR. DEVLIN:

[9] Substantially similar

[10]    THE WITNESS: Just from

[11] the outside, just this part and

[12] this part. This part wasn't

[13] there

[14]    MR. POPILOCK: All

[15] right

[16]            BY MR. POPILOCK:

[17]    Q: Now, you have pointed to Exhibit-B —

[18]    A: What I explained, the 90 degree plate

[19] with the pipe sticking out of it

[20]    Q: There is an angle iron on the outside

[21] with a pipe that sticks out of it that would accept

[22] the area where the cable goes through?

[23]    A: The cable goes through, correct

[24]    Q: And then on the inside, there is a

Page 55

[1] circular collar as well that's actually welded to

[2] the angle iron

[3]    Do you see that in these

[4] exhibits?

[5]    A: Yes.

[6]    Q. And you are telling us that the

[7] collar on the inside was not attached to the angle

[8] iron when you saw them in October of 1997?

[9]    A: They weren't even there. They were

[10] nonexistent. It was just this, just the bent plate

[11] and the piece of pipe. The inside collar was

[12] nonexistent

[13]    Q: So you had occasion to fully see the

[14] area underneath the angle iron, correct?

[15]    A: I didn't physically recall looking

[16] underneath it, but changing the cables, you could

[17] pick the guard up whereas, if it had the collar on

[18] it, you would not be able to pick the shield up at

[19] all. Do you understand?

[20]    Q: I do. So in October of 1997, you

[21] were there to change cables?

[22]    A: Correct

[23]    Q: And you recall on that occasion when

[24] you were changing the cables that you were able to

Page 56

[1] take the angle iron and slide it up the cable?

[2]    A: Correct

[3]    Q: So it wasn't actually attached to the

[4] drum?

[5]    A: That's correct.

[6]    Q: That turns, winding the cable around

[7] it, is that right?

[8]    A: That's correct.

[9]    Q: And that was true for all six cables

[10] and all six guards?

[11]    A: I don't recall that on all of them

[12]    Q: Do you remember how many cables you

[13] changed or replaced in October of 1997?

[14]    A: No, I don't.

[15]    Q: If you look at your invoice or your

[16] ticket, does that help refresh your recollection at

[17] all as to how many cables you replaced?

[18]    A: No, it doesn't.

[19]    Q: Do you remember which of the six

[20] cables you replaced? Do you have any recollection

[21] replacing one, in particular?

[22]    A: It was the left side door

[23]    Q: If you are standing inside the

[24] building?

Page 57

[1]    A. Inside looking out, left side

[2]    Q: You remember working on that door at

[3] least?

[4]    A: I remember the middle — one of them

[5] being the middle cable. As far as how many other

[6] cables, I don't remember.

[7]    Q: And as you look at the three exhibits

[8] of A, B and C, the guards that you have in front of

[9] you here on the table, are you able to tell me at

[10] least from the outside angle iron which of the

[11] three most resemble the one you observed in October

[12] of 1997? They are slightly different.

[13]    A: Well, the outsides are the same.

[14]    MR. DEVLIN: The

[15] outsides are the same, because

[16] they are angling?

[17]    THE WITNESS: That's

[18] all it was.

[19]            BY MR. POPILOCK:

[20]    Q: If you look at the piping as well.

[21] one of the pipes has a skirt around it where it

[22] meets the angle iron

[23]    Do you see that?

[24]    A: Yes.

Jamie Douglas v.
Schweiss Distributing, Inc., et al.
Case 2:02-cv-04556-WY    Document 26-2    Filed 06/23/2003    Page 7 of 46

William Resch
March 11, 2003

Page 98

[1] the top. He's pulling all of the tightness up at
[2] the top and not the bottom.

[3]    Q: Did you ever have to adjust a drum;
[4] that is that the drum was not properly set, so
[5] that when it rotated, it wasn't starting at the
[6] right point to take a door all the way up to bring
[7] a door all the way down?

[8]    A: No.

[9]    Q: Okay. When you were finished
[20] installing the cable did the door work properly?

[21]    A: Yes.

[22]    Q: Okay. Was there any problems that
[23] you could see with the door, the operation of the
[24] door when you were done in October of '97?

[25]    A: Not that I had seen, no.

[16]    Q: Now, showing you Exhibit-A, as you
[17] sit here today, you have a specific recollection
[18] that the shield that was on the left-hand door, as
[19] you looked outside, as you were inside the building
[20] looking outside —

[21]    A: Correct.

[22]    Q: — the drum that you were worked on
[23] the shield that was sitting on that drum had a
[24] right angle and it had a pipe that the cable

Page 99

[1] threaded through, but it had absolutely no collar
[2] present?

[3]    A: Correct.

[4]    Q: So that you could simply pick the
[5] angle up and slide it up the cable and if
[6] necessary, drop it down again?

[7]    A: Correct.

[8]    Q: It just floated on the cable, it was
[9] not attached to the drum in any manner?

[10]    A: Correct.

[11]    Q: Okay. Now, when you went out in
[12] January of — I am sorry. It was Resch-3. Let me
[13] get the right date. January 17, 2002.

[14]    Do you have a copy of that?

[15]    A: Yes.

[16]    Q: Can you take a look at the order
[17] that's in front of you? It indicates that the date
[18] — it looks like it's computer printed up there.
[19] It says January 4, 2002, and underneath it says
[20] January 17, 2002.

[21]    Do you know why there is a
[22] difference? Those dates? Do you need me to point
[23] that out to you?

[24]    A: The date that's typed in the computer

Page 100

[1] is probably more likely when the call was taken.

[2]    Q: Whose handwriting says 1/17/02, Bill
[3] and Doug?

[4]    A: I don't know.

[5]    Q: And it says M, and there is an X and
[6] T and there is an X.

[7]    Do you know why?

[8]    A: No, I don't.

[9]    Q: Do you know whether or not you have a
[20] recollection that day of actually traveling to the
[21] facility? M stands for mileage?

[22]    A: Yes.

[23]    Q: Do you have a recollection of
[24] traveling that day?

[15]    A: I know we had to get there, but as
[16] far as — I don't know what you are trying to
[17] gather, I don't know.

[18]    Q: I understood from before what you
[19] said was you would always mark your mileage down,
[20] and you would mark your travel time down?

[21]    A: That's all the secretary's
[22] handwriting there, or whoever — ours was all done
[23] on our time card. We don't write any of this.

[24]    Q: Now, on this document, so that I am

Page 101

[1] clear, the description of the work 'need brake
[2] solenoid'?

[3]    A: Yes.

[4]    Q: That doesn't refer to any part of the
[5] bifold doors?

[6]    A: No. That's dealing with those doors.

[7]    Q: Above it, it says, 'adjust cables on
[8] two bifold doors.'

[9]    That is the work that you
[10] performed on the bifold doors?

[11]    A: That's when I was over, moving the
[12] compost and stuff out of the way.

[13]    Q: Okay. How much compost had built up
[14] under the door?

[15]    A: At that time, I think it was rainy
[16] that day and it was real muddy.

[17]    Q: Quarter inch? Half-inch? An inch?

[18]    A: Oh, there could be globs of it in the
[19] corners of your jambs. It all depends.

[20]    Q: When you say jambs, what part are you
[21] referring to?

[22]    A: The sides of the doors. When it's
[23] open, the actual sides of your opening.

[24]    Q: And had you ever seen that before

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF PENNSYLVANIA

* * * * * * * *

JAMIE DOUGLAS,              *

     Plaintiff         *    Case No.

     vs.               *    02-4556

SCHWEISS                    *

DISTRIBUTING,               *

INC., SCHWEISS              *

BI-FOLD DOORS and           *

CALDER DOOR AND             *

SPECIALTY CO.,              *

     Defendants         *

* * * * * * * *


DEPOSITION OF

DOUGLAS HERR

MARCH 28, 2003





Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

**Page 14**

1 existence or non-existence of cable
2 shields or guards on the doors?
3 A.I don't understand. You mean
4 just here recently or ---?
5 Q.At any point in time have you
6 discussed with your co-employees at
7 Calder whether there were cable
8 shields on the doors at any time?
9 A.I hope I'm getting this right.
10 ATTORNEY ABELL:
11 If you don't understand
12 the question, just tell him
13 you don't understand the
14 question.
15 A.I don't understand the
16 question.
17 BY ATTORNEY POPILOCK:
18 Q.All I want to know is, at any
19 point in time, including up through
20 today have you ever talked with your
21 co-employees at Calder about whether
22 there were cable shields on those bi-
23 fold doors at any time?
24 A.Yes.
25 Q.All right. And who have you

**Page 15**

1 talked to about that?
2 A.I would say the service guys
3 Q.Can you give me some names?
4 A.Don, Vern.
5 Q.Vern?
6 A.Uh-huh (yes). Vern, I'm
7 sorry.
8 Q.Anyone else?
9 A.I think basically we all ---.
10 Don, Vern, Jay
11 Q.How about Bill?
12 A.And Bill, yeah. He's my
13 partner, yes.
14 Q.And were you all discussing
15 the cable shields together or have
16 you had separate conversations with
17 each of these people?
18 A.One more time.
19 Q.Have you had discussions with
20 each of these four people separately
21 about the cable guards or have you
22 discussed them generally as a group?
23 How did these conversations come
24 about?
25 ATTORNEY ABELL:

**Page 16**

1 He wants you to exclude
2 any discussions that I was in
3 attendance.
4 A.Well, if you're just saying we
5 just talked about them. I mean, it
6 wasn't a big deal. See, I wasn't
7 there before so I didn't understand
8 any of that. But I'm going to stop
9 babbling.
10 BY ATTORNEY POPILOCK:
11 Q.That's okay. I just want to
12 know --- I know you've had two
13 occasions now to drive up at least in
14 the car with Mr. Calder and your co-
15 employees. Did the conversation
16 about the cable guards come up during
17 those trips?
18 A.No, not that I can remember.
19 Q.When was it then that you
20 talked with these guys about these
21 cable guards?
22 A.I have no idea. I see what
23 you're trying to ask me, but I don't
24 know.
25 Q.Do you remember what they told

**Page 17**

1 you about the cable guards?
2 A.I know what they were like
3 when I was there.
4 Q.I understand. I'm trying to
5 separate out what you did when you
6 were there from what others may have
7 told you that they did or what they
8 saw.
9 A.Three before?
10 Q.Right. And in those
11 conversations that you had with Don
12 and Vern and Jay and Bill, what did
13 they tell you that they knew about
14 these cable guards?
15 A.Basically the same thing that
16 I knew.
17 Q.Which is what?
18 A.That you could pick them right
19 up off the spool.
20 Q.All right. And how do you
21 know that?
22 A.I changed it.
23 Q.All right. And when did you
24 first see the cable guards?
25 A.When Vern dropped the cables

**Page 16** (partial right column)

1 down the
2 pulled th
3 Q.And w
4 2001?
5 A.To the
6 was. As
7 good on e
8 Q.And di
9 these oth
10 Jay and
11 with the
12 discuss t
13 A.Vern w
14 Q.All rig
15 you?
16 A.Uh-huh
17 Q.Was th
18 A.Yes. I'
19 Q.How al
20 A.No, the
21 Q.Did yo
22 you four
23 cable gu
24 A.I don't
25 it. There

**Page 17** (partial right column)

1 went to d
2 no need t
3 Q.Have t
4 they exp
5 the abili
6 down th
7 A.Had the
8 Q.Yes.
9 A.Yes.
10 Q.When
11 A.I guess
12 know.
13 Q.Was it
14 filed?
15 A.Well, a
16 Q.And y
17 you rem
18 2001 yo
19 the cable
20 A.I didn't
21 I just kn
22 Q.Did the
23 after the
24 what the
25 cable gu

**EXHIBIT 2**

# AFFILIATED ENGINEERING LABORATORIES, INC.

*Engineering Consultants*

1101 Amboy Avenue
Edison, NJ 08837-2856

Phone: (732) 225-0360

Fax: (732) 417-0165

June 18, 2003

Timoney, Knox, Hasson & Weand, L.L.P.
P.O. Box 7544
400 Maryland Drive
Fort Washington, Pennsylvania 19034-7544

Attention:  Richard T. Abell, Esq.

Re:    Douglas v. Schwiess v.
       Calder Door & Specialty Company
       Your File No. 7855-352
       Our File No. Q-6055

Dear Mr. Abell:

In accordance with your request, the writer has reviewed file material pertaining to the captioned matter. In addition, on 2/13/03 the writer traveled to the Modern Mushroom facility in Toughkenamon, Pennsylvania and inspected the door system involved in the captioned matter. Photographs numbered 1 through 34, taken during this inspection, were previously forwarded to you for information and general reference.

The specific file materials reviewed include:

- Transcript of deposition testimony of Bruce Broomall;
- Transcript of deposition testimony of Richard O'Brien;
- Transcript of deposition testimony of Howard Flad;
- Transcript of deposition testimony of Arturo Illas;
- Transcript of deposition testimony of William Recchiuti;
- Transcript of deposition testimony of William Resch;
- Transcript of deposition testimony of Jay Shertzer;
- Transcript of deposition testimony of Douglas Herr;
- Transcript of deposition testimony of George Calder;
- Transcript of deposition testimony of Donald Geib;
- Transcript of deposition testimony of Verner Phipps;

Re:    Douglas v. Schwiess v.
       Calder Door & Specialty Company
       June 18, 2003
       Page 2 of 8

> - Transcript of deposition testimony of Michael Schweiss;
> - Deposition exhibits;
> - Various exemplar bi-fold door drum guards;
> - Plaintiff's Answers to Interrogatories;
> - Calder Door & Specialty Company's Answers to Interrogatories;
> - Schweiss Distributing's Answers to Interrogatories.

The inspected door was one of two, large, overhead, vertically bi-folding doors serving an equipment shed building identified by Modern Mushroom as the *"pre-wet building"*. The subject door was located on the left as observed from inside the building. It measured approximately 23 feet in height by 32 feet in width and was essentially comprised of two panels measuring approximately 11-1/2 feet tall by 32 feet wide connected by hinges in a vertical arrangement and suspended from the door header by means of hinges. Roller wheels were provided at the lower left and right corners of the door, which guided the door bottom vertically along steel channels located on the left and right sides of the doorframe. The door opened and closed in power operation by means of a 1.0 horsepower electric motor with an electric brake; a reduction gear drive; and a jackshaft and winding drum/cable system. The motor, drive and jackshaft system were located on the interior side of the door near the bottom edge and moved upward and downward during door opening and closing. The door was provided with three, approximately ¼-inch diameter cables that were affixed to the door frame header at equal lateral spacing. At the time of the inspection, the door was operated by means of up and down continuous pressure buttons. Motion of the door upward and downward was effectuated by the motor turning the jackshaft and causing the drums to wind the cable up to lift the bottom of the door upward or pay out cable to allow the door to move downward. As the bottom edge of the door moved upward to open, the hinge between the two door panels moved outward and the two panels folded. At the time of the inspection, the interior side of the door was coated with thermal insulation material that appeared to have been sprayed onto the door. The subject door was manufactured by Schweiss Automatic Bi-fold Doors of Fairfax, Minnesota (Schweiss).

Specific attention was paid to the jackshaft and winding drum system during the inspection. The jackshaft was essentially an approximate 1-1/4 inch diameter solid steel shaft located near the bottom edge of door that functioned to drive the three winding drums at the bottom of the cables. The drums measured approximately 3 inches in diameter by 12 inches in length and wound cable (i.e., upon opening of the door) in a direction such that the top of the drum moved away from the door panel and the bottom moved toward the door panel and the cable spooled onto the front of the drum (i.e., on the side away from the door panel). At the time of the inspection, the nip points between the cables and the drums of the jackshaft system were covered with sheet metal guards. The guards were essentially composed of light gauge sheet metal formed into a 90-degree angle of approximately 7 inches in height by 5 inches in depth by 7 inches in width. Each guard was provided with a short section of approximate 1/2 diameter tubing through which the cable passed. The guards were engaged with their respective drums by

Re:   Douglas v. Schwiess v.
        Calder Door & Specialty Company
      June 18, 2003
      Page 3 of 8

means of circular steel collars that were diametrically split and provided with a hinges and threaded fasteners for purposes of installing them around the drums. The remaining portions of the rotating jackshaft remained unguarded.

At the time of the inspection, a warning sign measuring roughly 8 inches tall by 11 inches wide was located on a side of the door frame, approximately 5 feet above the ground. The warning included a pictogram depicting a person positioned underneath the closing door. The sign indicated:

*"Stand Back!*
*Door Could Crush You!*
*Stand Away While Closing or Opening."*

*"Warning:*
*To prevent entrapment - Do not start door downward unless doorway is clear.*

*Important Safety Information*
*Bi-fold doors are very heavy. These doors are under extreme tension and can exert strong forces. Improper use or maintenance of this door could lead to severe injury or death. Adhere to the precautions given below:*
*1. Keep the door in full view and free of obstructions while operating.*
*2. Do not allow children to operate door, including its electrical controls.*
*3. Avoid standing in or walking through doorway while it is moving.*
*4. Unlatch the side latches before operating the door.*
*5. Never leave the electrical controls while door is operating.*
*6. Visually inspect the door and its hardware monthly for worn or broken parts and out of adjustment conditions.*
*7. Keep the cables the proper tension & in good condition.*
*8. Call a competent service person from a qualified door agent for adjustments, repairs and periodic maintenance as recommended by the manufacturer."*

It is understood, based upon file material reviewed, that some changes were made to the door between the time of the accident and the time of the inspection. It is indicated that the door control at the time of the accident included momentary pressure, UP, DOWN and STOP buttons. This control would move the door in the upward or downward direction until it reached its respective travel limits upon momentarily pressing the UP or DOWN button and thus would allow the operator to walk away from the control. In addition, the door was provided with blanket insulation that was held in place between exterior sheeting and the frame of the door panels.

It has been reported that on 1/14/01 Mr. Jamie Douglas was employed by Modern Mushroom as an equipment operator at their Toughkenamon, Pennsylvania facility. Reportedly,

Re:    Douglas v. Schwiess v.
          Calder Door & Specialty Company
       June 18, 2003
       Page 4 of 8

at approximately 3:30 -4:00 AM on said date, Mr. Douglas sustained injury when his hand
became caught in a nip point formed between a winding drum and cable on the subject bi-fold
door. It is understood that Mr. Douglas was separating some insulation material from the cable
and/or drum when his hand became caught. This occurrence and the resulting injury to Mr.
Douglas serve as the basis of the captioned matter.

          Evidence indicates that the subject door was installed by Schweiss in 1996. Evidence
further indicates that Calder Door and Specialty Company (Calder Door) had occasion to service
the subject bi-fold doors at the request of Modern Mushroom. Service records indicate that
Calder was called on several occasions between 09/22/97 and 04/03/98 to replace bi-fold door
cables and make other adjustments.

          Several Modern Mushroom employees testified in deposition (Richard O'Brien, Bruce
Broomall, Howard Flad, Arturo Illas and William Recchiuti) with regard to the subject
occurrence. These witnesses generally related that the *"pre-wet building"* was originally
provided with sliding doors, which proved to be problematic and thus resulted in the installation
of the subject Schweiss bi-fold doors. These witnesses further related that they experienced
some problems with the subject bi-fold doors, specifically that the cables would become frayed
and there was at least one occasion in which a drum guard became entangled in the cable and
was damaged, which prompted them to manufacture their own guards. They indicated that the
original drum guards were provided with continuous collars around the drums such that their
removal would require cutting the collars off. The replacement guards (both the ones made by
Schweiss and the ones made by Modern Mushroom) incorporated a split and hinged collar to
facilitate installation and removal of same. Mr. Recchiuti stated that the original thermal
insulation began falling from the door. Mr. O'Brien testified that Schweiss had recommended
the bottom drive configuration door. Mr. O'Brien indicated that rewiring the controller from a
momentary pressure operation to a continuous pressure operation, which was performed after the
accident, required approximately 10 minutes. Mr. O'Brien further indicated that there were no
drum guards on the doors at the time of the accident and that Calder had removed the guards. It
is noted, however, that Modern Mushroom witness testimony varies with respect to the number
of removed guards and the timeframe of their removal.

          Representatives of Calder Door (George Calder, Douglas Herr, Donald Geib, Verner
Phipps, Jay Schertzer and William Resch) testified in deposition regarding the subject matter.
These witness essentially asserted that they had never permanently removed any of the drum
guards on the bi-fold doors at Modern Mushroom. The Calder witnesses who specifically recall
the guards present on the doors during cable replacement work performed in the 1997/1998 time
frame indicate that the guards were not affixed to the drums by means of a collar, but rather were
fit around the cable and rested atop the drums such that they were free to slide up and down
along the cable. While these witnesses indicated that they had opportunity to change cables for
the subject doors prior to the accident, they stated that did not provide the cable and that they

Re:    Douglas v. Schwiess v.
         Calder Door & Specialty Company
         June 18, 2003
         Page 5 of 8

replaced any guards that needed to be removed to change cables. In addition, some Calder witnesses testified that they had occasion to make adjustments to cable tension and limit switches on Modern Mushroom's bi-fold doors.

Mr. Michael Schweiss, owner of Schweiss Distributing, Inc., testified in deposition that the company was founded in 1994 and that the bi-fold doors they manufactured at that time were equipped with drum guards. Mr. Schweiss provided a sketch of the first drum guard designed by Schweiss, which included a collar that fit around the drum, an integral cable guide tube and a 3-sided sheet metal cowling that fit atop same without being affixed to the collar or guard. Mr. Schweiss explained that the base model doors were generally bottom drive units with no electrical safety features. He indicated that Schweiss offers a bi-fold door with an overhead drive, which, for various reasons, represented the minority of Schweiss bi-fold door sales. In addition, for an additional cost, customers can opt for various safety features including electric photo eye sensors, continuous pressure switch operation (i.e., dead man switch) and door base safety edge. Mr. Schweiss explained that both the safety edge and electric eye could be configured to either stop door motion or reverse its direction. Mr. Schweiss described that the standard door insulation is blanket type batting without interior sheeting or backing, but Schweiss does offer optional hardboard insulation or interior sheeting material to cover the blanket batting. Mr. Schweiss further described that some doors having larger diameter drums are provided with drum guards that include a collar around the drum and a cable guide tube but do not have any sheet metal cowling.

Evidence indicates that there have been numerous drum guard designs for Schweiss bottom drive bi-fold doors. Mr. Schweiss described the first design as having a collar, a guide tube and a 3-sided sheet metal shield that was not affixed to either the collar or tube. Additionally, Mr. Schweiss described that guards were produced that included only the drum collar and cable guide tube. Mechanical drawings produced by Schweiss depict two additional designs that are essentially the same except for the provision of a solid collar and a split collar. Further, the writer was provided with three exemplar guards, two of which were reportedly manufactured by Schweiss, but differ from the aforementioned mechanical drawings and one that was reportedly manufactured by Modern Mushroom.

File material indicates that approximately 2 years and 9 months transpired between the time Calder Door last performed work on the Modern Mushroom bi-fold doors and the time of the subject accident. In addition, records indicate that Modern Mushroom had ordered six ¼-inch cables and six replacement drum guards one day after the subject accident.

Based upon file materials reviewed, inspection of the subject door, examination of exemplar cable drum guards and the foregoing, it is the writer's opinion that the subject 1/14/01 accident and resulting injury to Mr. Douglas did not result from any impropriety or shortcoming on the part of Calder Doors. Calder neither manufactured nor installed the door. Evidence does

Re:     Douglas v. Schweiss v.
        Calder Door & Specialty Company
        June 18, 2003
        Page 6 of 8

not support that Calder Door performed door service that had any causal relationship to the subject accident.

Evidence does not support any allegation that Calder Doors removed the drum guards on the subject bi-fold doors. All of the Calder service technicians that had opportunity to work on the subject doors testified that they did not remove the guards. In addition, the Calder service technicians indicate that the guards were free to slide up and down along the cable from the drum, which is consistent with the type of guard described by Mr. Schweiss as being the original design. Considering that the original equipment would have been provided with guards having continuous collars (i.e., as opposed to split collars), removal of the collars and associated cable guide tubes would require cutting the collar with either an acetylene torch or an abrasive saw, which is a fairly laborious and time-consuming task. None of the Calder Door representatives testified that they had cut or burned any hardware from the subject doors. Rather, the only witness who specifically recalled removing a guard with the use of "zip cutter" was the Modern Mushroom welder Arturo Illas.

Calder Door was not under contract with Modern Mushroom to provide maintenance for the subject bi-fold doors. Rather, Modern Mushroom called Calder Door to perform specific tasks. Review of Schweiss literature pertaining to their bi-fold door reveals that the doors require a significant amount of maintenance, much of which pertains to the condition and tension of the lift cables. There is evidence of one or more drum guards being damaged as a result of being wrapped up with its associated cable, which is likely the result of either a frayed or overly slack cable condition.

It is the writer's further opinion that the subject bi-fold door, as designed, manufactured and installed by Schweiss, had significant safety deficiencies that rendered it unsafe for its intended use, which condition resulted in the subject accident. In the writer's opinion, Schweiss failed to exercise reasonable engineering safety protocol in the design of the subject bi-fold door, which resulted in a product that was devoid of the common and readily available safeguards required to make it reasonably safe.

While it may have certain desirable marketable features, provision of a bottom drive unit on a bi-fold door (as opposed to a top mounted drive system) introduces unique hazards to persons located in the vicinity of the door while same is opening or closing. During closing, there is a risk of entrapment, which is common to most power operated doors. However, the risk of entrapment for a bi-fold door is more significant than for other type doors due to relatively large size and associated weight of bi-fold doors and their lack of counterbalancing. During opening, bottom drive bi-fold doors have a unique hazard in the potential for persons to contact various moving parts including three winding drum nip points. In either direction of operation, bi-fold doors pose a significant risk of crushing injury to persons in the doorway in the event of suspension system failure. As such, the subject door has a higher potential for significant

Re:   Douglas v. Schwiess v.
      Calder Door & Specialty Company
      June 18, 2003
      Page 7 of 8

personal injury than other type power operated overhead doors.  Accordingly, the subject door
requires a greater degree of safeguarding.  Typical safeguards for power operated overhead doors
included continuous pressure controls, a bottom edge sensor and a photo eye sensor, all of which
could readily have been implemented by Schweiss at the time the subject door was manufactured
and, in fact, were offered as additional cost safety features.  In the writer's opinion, the provision
of one or more of the aforementioned safety items as standard equipment was required to make
the subject bi-fold door reasonably safe and suitable for its intended use.

The safety standard that is most applicable to the subject bi-fold door is Underwriters
Laboratories Standard for Door, Drapery, Gate, Louver, and Window Operators and Systems
(UL 325).  The standard indicates in paragraph 1.5 under the subtitle *"Scope"*:

> *"A product that contains features, characteristics, components, materials, or
> systems new or different from those covered by the requirements in this standard,
> and that involves a risk of fire, electric shock, or injury to persons shall be
> evaluated using the appropriate additional component and end product
> requirements as determined necessary to maintain the acceptable level of safety
> as originally anticipated by the intent of this standard."*

The standard also includes a hierarchy of measures to prevent personal injury resulting from
operation of industrial or commercial doors, giving the highest priority to continuous pressure
controls.  The effectiveness of continuous pressure controls in preventing persons from making
contact with moving power operated overhead doors is clearly recognized by interested parties.
In the writer's opinion, considering the greater risk of personal injury associated with bottom
drive bi-fold doors relative to other type power operated doors, continuous pressure controls are
requisite to reasonably safe operation of such doors.  Provision of continuous pressure controls
and/or a photo eye sensor on the subject door would have prevented the 1/14/01 accident
occurrence.  Provision of a safety edge sensor on the door would have given Mr. Douglas a
means of preventing the accident or mitigating the resulting injuries.  In the writer's opinion,
Schwiess' failure to provide any of the aforementioned safeguards as standard equipment
constitutes a deviation from the normal practice of safe design and rendered the subject door
defective.  It is noted that continuous pressure controls could readily have been incorporated as
standard equipment at negligible additional cost and would have ensured continued product
safeguarding in the foreseeable event that barrier guards be removed.

In the writer's opinion, the drum guards provided with the subject door (and their
subsequent replacements) do not provide adequate safeguarding of the jackshaft and the
associated nip points.  The guards do not prevent access to the nip points and do not cover the
rotating jackshaft as required by the Safety Standard for Mechanical Power Transmission
Apparatus (ANSI B15.1).  Said standard requires that the entire jackshaft be covered in a manner
that prevents entry of *"hands, fingers or other parts of the body into a point of hazard by*

Re:    Douglas v. Schwiess v.
       Calder Door & Specialty Company
       June 18, 2003
       Page 8 of 8

*reaching through, over, under or around the guard.*" It is evident, based on the number of "*trial and error*" drum guard design iterations and the apparent chronic problems with same, that Schwiess was aware that the drum guards were not effective.

Furthermore, the removal of drum guards by the end user is highly foreseeable, as is evidenced by Schwiess' production of replacement guards in anticipation of their removal. Because of the foreseeability of drum guard removal and the high potential for injury to persons in the doorway, the subject door required a positive means of preventing persons from being near the door during operation to make the door reasonably safe. As indicated above, the most effective, most widely utilized and most readily implemented means of positively preventing operators from being near the door during its operation is the use of continuous pressure controls. Provision of a photo eye sensor and/or a bottom edge sensor is another common means of safeguarding both the operator and others from the hazards associated with bi-fold doors with or without continuous pressure controls. In the writer's opinion, both effective guarding of the jackshaft and provision of some form of electrical safeguard as standard equipment were required to make the subject door a reasonably safe product. By utilizing an incomplete and ineffective guarding system, the removal of which was readily foreseeable and even anticipated, and not incorporating any electrical safeguards as standard equipment, Schwiess provided a defective product, which defective condition resulted in the subject accident.

It is the writer's concluding opinion that the subject 1/14/01 accident and resulting injury to Mr. Douglas did not result from any improper action or inaction on the part of Calder Door & Specialty Company. Had Schwiess exercised reasonable engineering design judgement and provided a door having reasonable, customary and readily incorporated safeguards, consistent with the requirements of applicable safety standards, the subject accident would have been avoided. As indicated above, removal of the drum guards on the subject door was foreseeable; Schwiess was aware that guards were likely to be removed by end users; and, in the writer's opinion, the subject door required electrical safeguards to make it reasonably safe, regardless of the existence and/or effectiveness of the guards.

Please feel free to contact the writer should further discussion or information be required.

Very truly yours,

William J. Meyer, P.E.
Engineering Consultant

WJM/mfn

**EXHIBIT 3**

# In The Matter Of:

*Jamie Douglas   v.*
*Schweiss Distributing, Inc., et al*

---

*William Resch*
*March 11, 2003*

---

*Brusilow & Associates*
*1926 Arch Street*
*1st Floor West*
*Philadelphia, PA   19103-1404*
*(215) 977-9700    FAX: (215) 977-9773*

Original File RESCO311.V1, 135 Pages
Min-U-Script® File ID: 0503589198

**Word Index included with this Min-U-Script®**

---

Page 78

[1] **Q:** Do you recall ever having encountered

[2] any problems with the bifold doors for the work

[3] that you performed?

[4]            **MR. ABELL:**

[5] Encountering problems in

[6] completing that day or any

[7] problems at all?

[8]    **MR. POPILOCK:** Any

[9] problems at all?

[10]    **THE WITNESS:** Other

[11] than the time I went down to

[12] work on the dock doors and I

[13] told them I will send someone

[14] else down to do it, no.

[15]            **BY MR. POPILOCK:**

[16]    **Q:** Do you have that Calder Door has any

[17] type of safety role when they are performing

[18] maintenance on the doors?

[19]    **A:** What do you mean by that?

[20]    **Q:** If you encounter what you feel to be

[21] a safety concern for one of the doors, do you feel

[22] that you have any role in informing the owner about

[23] that safety concern?

[24]    **A:** As far as fixing the safety problem,

Page 79

[1] we will fix it. I mean, we are not going to do

[2] something intentional or — as far as if there is a

[3] safety issue, we will fix it.

[4]    **Q:** For example, if you get a call from a

[5] customer that they want a cable that has snapped on

[6] a door to be replaced and you get there and you are

[7] performing your work and you see something else

[8] that's wrong with the door that you consider to be

[9] a safety concern, is that something that you would

[10] typically raise with the customer?

[11]    **A:** We would fix it, and then when the

[12] customer comes out, let them know, Hey, this was,

[13] something else that was wrong, so we fixed that for

[14] you, too, while we were here.

[15]    **Q:** And then they would be billed for

[16] that?

[17]    **A:** Correct.

[18]    **Q:** I might have asked you this earlier,

[19] and I apologize if I am repeating myself.

[20]    On the occasion when you

[21] were there in October of 1997, do you recall any of

[22] the guards or shields being missing from any of the

[23] cables?

[24]    **A:** No, I don't believe they were all

Page 80

[1] there.

[2]    **Q:** When you left the job site on October

[3] 26, 1997 were the guards that were in place on the

[4] cables still there? Did you leave them on the

[5] cables, the new ones? That was a bad question.

[6]    Did you leave the guards on

[7] the new cables that you installed on the date when

[8] you performed that work in 1997?

[9]    **MR. DEVLIN:** I have an

[10] objection to the form. He said

[11] he only recalls doing one cable.

[12] You are saying cables.

[13]    **MR. POPILOCK:** Okay.

[14]            **BY MR. POPILOCK:**

[15]    **Q:** When you replaced the cable that you

[16] recall replacing in October of 1997, do you recall

[17] putting the shield back on that was in place when

[18] you arrived?

[19]    **A:** Yes.

[20]    **Q:** Do you ever recall taking any shields

[21] off and not replacing them?

[22]    **A:** No.

[23]    **Q:** Have you ever had any discussions

[24] with anyone at Calder as to whether that has taken

Page 81

[1] place?

[2]    **A:** No.

[3]    **Q:** Has anyone at Calder ever told you

[4] that they have encountered the same type of shield

[5] that you were describing earlier that did not have

[6] the collar on the inside that would go around the

[7] drum?

[8]    **A:** At what time? Before the accident?

[9]    **Q:** At any time.

[10]    **A:** Well, sure, we all remember some of

[11] the shields lifting up.

[12]    **Q:** You have had discussions with other

[13] Calder employees about what these shields looked

[14] like?

[15]    **A:** Yes.

[16]    **Q:** And who did you have these

[17] discussions with?

[18]    **A:** With Vern and Don and Doug.

[19]    **Q:** Vern, Don, and Doug?

[20]    **A:** Yes.

[21]    **Q:** And each of them also remember a

[22] shield similar to the one you described earlier

[23] that could be moved up and down the cable?

[24]    **A:** I do not know if Doug does, but Don

Page 86

[1] the inside?

[2] **A:** Yes.

[3] **Q:** Okay. Where did you see them?

[4] **A:** Right here in front of me.

[5] **Q:** All right.

[6] **A:** And the photographs, also.

[7] **Q:** All right. The photographs that you

[8] reviewed with counsel?

[9] **A:** Yes.

[10] **Q:** And other than that, that was the

[11] first time that you had seen them with the collar

[12] on the inside?

[13] **A:** Yes.

[14] **Q:** When you visited the plant in October

[15] of 1997 did you review any manuals for the

[16] operation or maintenance of the doors?

[17] **A:** No.

[18] **Q:** Do you recall operating the doors in

[19] October of 1997?

[20] **A:** Yes, I do.

[21] **Q:** And what do you recall about that?

[22] **A:** The push-buttons for the motors were

[23] right there beside the -- in between the two doors

[24] on a center post.

Page 87

[1] **Q:** And, as you are in the inside looking

[2] out, there is a door on the left and a door on the

[3] right, and in between the two doors, there is a

[4] part of the building?

[5] **A:** Correct.

[6] **Q:** And you recall the two controllers

[7] for the doors being in this area between the two

[8] doors?

[9] **A:** Yes.

[10] **Q:** Do you recall anything unusual in the

[11] manner in which these doors operated when you

[12] activated the controller?

[13] **A:** I don't recall that. I don't

[14] remember.

[15] **Q:** Do you recall having a feeling at all

[16] about these doors, about the size of them, about

[17] the manner in which they operated, about the safety

[18] of them when you first encountered them in October

[19] of 1997?

[20] **A:** Do you mean just looking at them?

[21] **Q:** Or operating them.

[22] **A:** I thought they were pretty

[23] impressive, but other than that, it's a door.

[24] **Q:** Did you have any safety concerns at

Page 88

[1] all in the manner in which the doors operated when

[2] you performed maintenance on them in October of

[3] 1997?

[4] **A:** My safety concerns as far as?

[5] **Q:** As far as the doors having the cables

[6] snap, as far as the shields being inadequate, any

[7] concerns at all that you recall having in your

[8] mind?

[9] **A:** Not really.

[10] **Q:** Have you ever been asked to remove

[11] any type of safety device when you were ever on a

[12] job?

[13] **A:** No.

[14] **MR. ABELL:** I assume

[15] you mean remove and not replace

[16] it by the end of the service?

[17] **MR. POPILOCK:** Exactly.

[18] BY MR. POPILOCK:

[19] **Q:** If you were asked by a customer to

[20] remove any type of safety device and not replace

[21] it, is that something that you would do, if

[22] requested?

[23] **A:** Personally, no.

[24] **Q:** Do you know if there is a company

Page 89

[1] policy concerning that?

[2] **A:** Not offhand, but if I know George,

[3] there probably is one.

[4] **Q:** Do you recall generally the condition

[5] of the batting on the inside of the door in October

[6] of 1997?

[7] **MR. ABELL:** By batting,

[8] do you mean installation?

[9] **MR. POPILOCK:** Yes.

[10] **THE WITNESS:** I

[11] remember it being in — other

[12] than it being in rough shape,

[13] no

[14] BY MR. POPILOCK:

[15] **Q:** Do you recall it being in rough

[16] shape?

[17] **A:** As far as there might have been some

[18] places where the insulation was torn.

[19] **Q:** Do you have a specific recollection

[20] of that?

[21] **A:** Not offhand, no.

[22] **Q:** Did you make any recommendations to

[23] the owner concerning replacement of that

[24] insulation?

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

JAMIE DOUGLAS,          \*

      Plaintiff      \*     Case No.

      vs.           \*     02-4556

SCHWEISS                \*

DISTRIBUTING,           \*

INC., SCHWEISS          \*

BI-FOLD DOORS and       \*

CALDER DOOR AND         \*

SPECIALTY CO.,          \*

      Defendants     \*

\* \* \* \* \* \* \* \*

DEPOSITION OF

JAY SHERTZER

MARCH 28, 2003

COPY

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

2 performed work on the doors, did
3 other individuals from Calder work on
4 the limit switches?
5 A I don't recall. I really
6 don't.
7 Q You don't remember one way or
8 the other?
9 A One way or the other I don't
10 know.
11 Q Did anyone at Calder Door ever
12 tell you that they removed the cable
13 guards from these bi-fold doors?
14 A No.
15 Q Now, you came up to your
16 deposition today with Mr. Calder and
17 is it Mr. Herr?
18 A Yes.
19 Q And you drove up together?
20 A Yes.
21 Q Did you come up the last time
22 for the deposition?
23 A No, I did not.
24 Q On your way up here today did
25 you discuss what your deposition was

Page 111

1 going to be about?
2 A Briefly. I mean, you have to
3 understand one thing, since I found
4 out about this, this thing has gone
5 through my mind a million times. I
6 mean, of course we talk about it.
7 Q Has any of the other Calder
8 Door employees told you something
9 that didn't coincide with what your
10 recollection was concerning service
11 of the doors?
12 A No.
13 Q Did you review any deposition
14 transcripts?
15 A No.
16 Q Did you talk with Don and Dong
17 about times when you were out there
18 doing the work?
19 A I don't know. Do you mean
20 recently?
21 Q Yeah. Since the lawsuit has
22 been filed. Have you guys talked
23 about ---?
24 A Yeah, we talk about. We all
25 hate the damn door and stuff like

Page 110 - Page 113

1 that.
2 Q Why's that?
3 A Well, it's a pain in the neck.
4 It's a pain in a neck place. This
5 place stinks, it's dirty, it's
6 filthy And you never can go there
7 and get in and out in five minutes.
8 I mean, it's always, you know, an
9 hour, hour and a half, two hours.
10 It's just a pain in a neck door to
11 work on.
12 Q And I guess that's what I need
13 to know. Why is it a pain in the
14 neck to work on, besides the facility
15 being dirty and smelly? Is there
16 something about the door itself that
17 makes it difficult to work on?
18 A Well, it's not that it's
19 difficult, it's just time consuming.
20 we like to do everything in five
21 minutes and go home and take a nap.
22 ATTORNEY POPILOCK:
23 I don't have any other
24 questions.
25 A I'm not trying to be smart.

Page 113

1 RE-EXAMINATION
2 BY ATTORNEY DEVLIN:
3 Q Jay, I just have a couple
4 follow-up questions. Your Counsel
5 has handed us some Answers to
6 Interrogatories this morning and I
7 don't believe they were marked. I'd
8 like to mark them.
9 (Shertzer Exhibit Four
10 marked for
11 identification.)
12 BY ATTORNEY DEVLIN:
13 Q I'd like to put this in front
14 of you.
15 ATTORNEY ABELL:
16 Before you ask that
17 question. Even though it's
18 the first time it's marked,
19 I'd like the record to show
20 that it was shown to him and
21 asked questions of the witness
22 by Mr. Popilock.
23 ATTORNEY DEVLIN:
24 Yes.
25 BY ATTORNEY DEVLIN:

# In The Matter Of:

*Jamie Douglas   v.*
*Schweiss Distributing, Inc., et al*

---

*Donald Geib*
*March 11, 2003*

---

*Brusilow & Associates*
*1926 Arch Street*
*1st Floor West*
*Philadelphia, PA   19103-1404*
*(215) 977-9700    FAX: (215) 977-9773*

Original File GEIB0311 V1. 89 Pages
Min-U-Script® File ID. 3274504234

# Word Index included with this Min-U-Script®

Page 26

[1] objection. He said he only saw

[2] a couple of frays sticking out

[3] on a cable.

[4]     Go ahead, sir. You can

[5] answer.

[6]     THE WITNESS: Did you

[7] have a question? Sorry.

[8]         BY MR. POPILOCK:

[9]     Q: Did you see fraying on more than one

[10] cable?

[11]     A: Not that I recall. I mean, when I

[12] seen that and he said he wanted the cables

[13] replaced. I mean, we just went ahead and did the

[14] job he requested. And that was pretty much it.

[15]     Q: Did you have any discussion with

[16] Mr. O'Brien as to what might have been causing the

[17] fraying of this cable?

[18]     A: No, because I have seen cables fray

[19] on sectional doors. I mean, this is just — they

[20] break down sometimes. I never — it didn't seem to

[21] alarming to me.

[22]     Q: Now, when you operated the door did

[23] you observe how this guard would move as the door

[24] would open or close?

Page 27

[1]     A: Yes.

[2]     Q: And what would the guard do when the

[3] door was opening?

[4]     A: Well, with that cable coming down

[5] through the pipe, it just rode across the drum at

[6] the speed that that cable revolves around that

[7] drum, as it winds it up.

[8]     MR. ABELL: The witness

[9] is gesturing with his hand from

[10] side to side.

[11]         BY MR. POPILOCK:

[12]     Q: So the underside of the angle iron

[13] would ride on the cable as it wound around the

[14] drum?

[15]     A: Yes.

[16]     Q: Is that right?

[17]     A: Yes. And you have — if you have a

[18] picture of that drum — the cable built up the drum

[19] a little, really. So this was just resting right

[20] across that flat surface.

[21]     Q: Did that appear to impede the ability

[22] of the cable to wind?

[23]     A: No. There is not much weight, that

[24] that little thing on there, it sure don't affect

Page 28

[1] that.

[2]     Q: In September of 1997 did you have an

[3] understanding as to what the purpose of that angle

[4] iron was?

[5]     A: Yes.

[6]     Q: And what was your understanding?

[7]     A: It protects something from getting

[8] caught in the cable as it wraps around the drum.

[9]     Q: Did you understand that it was to

[10] protect also someone's hands from getting in there?

[11]     A: Well, I am sure it did enter my mind.

[12] But, yeah, that would be common sense. Anything

[13] that would get in there, you could not get wrapped

[14] around that drum between the drum and the cable.

[15]     Q: So at least in September of 1997, you

[16] understood that shield to be a safety shield?

[17]     A: Yes.

[18]     Q: Did you have any discussion with

[19] Mr. O'Brien about the manner in which the shield

[20] rode on that cable?

[21]     A: No. I mean it was just — I thought

[22] that was the design of the door. That never

[23] entered my mind that there would be any sleeve that

[24] should be there or anything.

Page 29

[1]     Q: Did you have any discussions with

[2] Mr. O'Brien about replacing the shields or getting

[3] a different type of safety guard?

[4]     A: No, because I never knew — I would

[5] never think anything would be available other than

[6] what was on. I thought that was it.

[7]     Q: Now, when you replaced the three

[8] cables on the left-hand door, did you also replace

[9] the shield?

[10]     A: Yes.

[11]     Q: So when you left the plant in

[12] September of 1997, after performing your work, to

[13] your knowledge, the left hand door had all three

[14] shields in place?

[15]     A: Yes.

[16]     Q: Let me see if we have that work

[17] order. I think I have marked that as Resch-1.

[18] Here it is. I am going to show you what's been

[19] previously marked as Resch Exhibit-1.

[20]     Tell me if that is the

[21] document that represents the invoice for the work

[22] you performed on that occasion.

[23]     A: Yes. That's my writing down in the

[24] left hand corner, and that's stating what I did

**EXHIBIT 4**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

JAMIE DOUGLAS                          :    NO. 02-4556
                    v.                 :
SCHWEISS DISTRIBUTING, INC.;           :
SCHWEISS BI-FOLD DOORS, INC.; and      :
CALDER DOOR & SPECIALTY COMPANY        :

- - -

March 27, 2003

- - -

        Oral deposition of MICHAEL L.

SCHWEISS, held in the Law Offices of Devlin &

Devine, 100 West Elm Street - Suite 200,

Conshohocken, PA 19428, commencing at 9:15 a.m.,

on the above date, before Judith E. Shaffer, Court

Reporter and Notary Public of the Commonwealth of

Pennsylvania.

- - -

DIAMOND COURT REPORTING
116 HEDGEROW COURT
DEPTFORD, NEW JERSEY 08096
856-232-6903
FAX 856-232-6197

DIAMOND COURT REPORTING

1      A.      Never -- yes, I have.  I mean, they

2  are always painted the same color as the door.  I

3  have painted black doors and I have painted white

4  doors.

5      Q.      Has your company ever painted the

6  cable shields a color different than the remaining

7  portions of the door?

8      A.      Never.

9      Q.      So whatever color the cable shield is

10 is the same color that the door itself is painted?

11     A.      Correct.

12             MR. DEVLIN:  The original?

13             MR. POPILOCK:  Right.

14             MR. DEVLIN:  The original cable

15     shields that are assembled there?

16             MR. POPILOCK:  Right.

17 BY MR. POPILOCK:

18     Q.      This cable shield that we have in

19 front of us here as Exhibit C that you have

20 identified as a Schweiss-manufactured shield has a

21 collar that it is hinged with a flange and a bolt

22 in it.

23             Do you see that?

24     A.      Yes.

113

1          Q.      Has your company ever manufactured a

2    collar that has this type of configuration?

3                  MR. DEVLIN:  This referring to the

4          collar?

5                  MR. POPILOCK:  Yes.

6                  MR. DEVLIN:  But he said he

7          manufactured this, Exhibit C.

8    BY MR. POPILOCK:

9          Q.      So that includes the interior collar

10   portion?

11         A.      This is my replacement shield.

12         Q.      Has your company ever manufactured a

13   shield that has a collar of a different

14   configuration?

15         A.      Never.

16                 MR. DEVLIN:  The original?  Your

17         original shield?

18                 THE WITNESS:  I'm sorry.  What

19         question do you have?

20   BY MR. POPILOCK:

21         Q.      Other than the type of collar that

22   has the hinge and the flange on it with the bolt,

23   has your company ever designed a shield that has a

24   collar of a different configuration?

114

1      A.      I have what comes with every

2  original door has a continuous pipe, no cuts, no

3  hinge on it.  It comes standard on every door.

4              MR. DEVLIN:  Mr. Schweiss, we have

5          in other depositions have referred to

6          this -- what I am pointing to on Exhibit

7          C -- as a collar.  It may be inaccurate but

8          that's for the three of us when we have been

9          talking about the product.  This has been a

10          collar, the guide tube -- actually we called

11          it a tube -- so if you refer to the collar

12          as a tube you may just confuse all of us

13          here.  But I am sorry we have confused you

14          but that's what we have been referring to as

15          a collar and then this as a guide tube.

16              Am I correct, gentlemen?

17              MR. ABELL:  Yes.  The tube is the

18          object that on the side of it has the cable

19          and the collar term we have been using that

20          inside it has the drive shaft.

21              THE WITNESS:  There are two kinds of

22          collars I have; a solid member, no breaks in

23          it and I have the replacement shield with

24          the break and the hinge on it so it's got

1      two breaks in it.

2           MR. DEVLIN:  Would you like me to go

3      down to my office and bring it back?

4           MR. POPILOCK:  Sure.

5           (Whereupon, a recess was taken.)

6           MR. POPILOCK:  Mr. Devlin has been

7      so kind to get from his office the other two

8      shields that have been marked as Exhibits A

9      and B.  I don't even know if they were

10     marked at anybody's deposition.

11          MR. DEVLIN:  They were marked at

12     depositions previously.

13  BY MR. POPILOCK:

14     Q.     If we look at Exhibit A which is the

15  darker of the two, is this the configuration of

16  the collar you were describing that has a

17  continuous piece of metal?

18     A.     Yes, it is.

19     Q.     And that's just cut from a tube?

20     A.     Yes.

21     Q.     And then welded fast to a bracket

22  attached to the angle iron?

23     A.     Yes.

24     Q.     When you were describing the other

1    BY MR. POPILOCK:

2        Q.        Why was it that your company

3    designed both of these type shields at the same

4    time?

5        A.        For replacement purposes.

6        Q.        So at the time that you were

7    originally designing the shields to be used on

8    cables for Schweiss doors you envisioned a need to

9    replace them at some point?

10       A.        Yes.

11       Q.        And why was that?

12       A.        Let's say you lift the door up with

13   a forklift and you load it onto the install

14   trailer.  It can be damaged in our yard or it can

15   be damaged in the customer's yard.  It could be

16   damaged when the customer has it at his premises.

17       Q.        So if I understand your testimony

18   then, the shield that had the split collar with

19   the hinge and the flange would have been first

20   designed sometime after 1994?

21       A.        Yes.

22       Q.        Do you know whether original design

23   drawings exist for shields that have the split

24   collar on them?

20

1   original door that went to Modern Mushroom would

2   have been the same as the shield that appears on

3   Schweiss 7?

4        A.        Yes.

5                  MR. DEVLIN:  With the addition that

6        Schweiss 7 doesn't show the third flat

7        shield that he previously said attaches to

8        the tube -- guide, cable guide.

9   BY MR. ABELL:

10       Q.        Now, you said before that you

11  started making the split replacement shields at

12  the time you started making the solid color

13  shields?

14       A.        Yes.

15       Q.        And I believe you said you started

16  making split collar shields because you were aware

17  that the original shields would be damaged?

18       A.        Could be damaged.

19       Q.        What type of damage were you aware

20  of that had occurred to shields prior to the

21  initiation of this lawsuit?

22       A.        When a customer leaves the cables

23  too loose they can get damaged.  They have already

24  been damaged by forklifts in loading or unloading

262

20

1   or installing the door, customers banging into

2   them.

3       Q.      You referenced a few moments ago

4   that one of the times that you are familiar with

5   shields becoming damaged is in the original

6   installation that the cable wasn't tightened

7   correctly or the limit switches weren't set

8   properly and that the cable could become wrapped

9   around the shield?

10      A.      Yes.

11      Q.      Did I understand that?

12      A.      Yes.

13      Q.      Have you ever been aware of

14  circumstances in which the shield was damaged by

15  the cable wrapping around the shield in

16  circumstances other than the original start-up of

17  the door?

18      A.      Yes, from cables being too loose.

19      Q.      So you are aware of the fact that

20  customers had let their cables get too loose after

21  the door was in use and the extra slack of the

22  cable eventually wrapped around the shield and

23  damaged it?

24      A.      Yes.

**EXHIBIT 5**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

JAMIE DOUGLAS                    :    NO. 02-4556
            v.                   :
SCHWEISS DISTRIBUTING, INC.;     :
SCHWEISS BI-FOLD DOORS, INC.; and :
CALDER DOOR & SPECIALTY COMPANY  :

- - -

March 27, 2003

- - -

Oral deposition of MICHAEL L.
SCHWEISS, held in the Law Offices of Devlin &
Devine, 100 West Elm Street - Suite 200,
Conshohocken, PA 19428, commencing at 9:15 a.m.,
on the above date, before Judith B. Shaffer, Court
Reporter and Notary Public of the Commonwealth of
Pennsylvania.

- - -

DIAMOND COURT REPORTING
116 HEDGEROW COURT
DEPTFORD, NEW JERSEY 08096
856-232-6903
FAX 856-232-6197

179

1  was in existence when the door was sold in 1996

2  and I think we looked at that earlier?

3       A.       Yes, it was.

4       Q.       And you are looking at Rosario 3 I

5  believe, the top photograph?

6       A.       Yes.

7       Q.       Now, that warning instructs the

8  user/operator of the door to stay at the

9  controller while the door is being operated; is

10 that right?

11      A.       Correct.

12      Q.       What is the purpose of that?

13      A.       You are moving a large piece of

14 equipment up and down.  For the safety of the

15 operator and people who may be around it and the

16 maintenance -- I mean, the concept of a piece of

17 equipment moving I want them to supervise the

18 operation of the door.

19      Q.       Your company offered as an option, a

20 safety option in 1996, a dead-man switch for this

21 controller; is that right?

22      A.       Yes.

23      Q.       And that dead-man switch would

24 require constant pressure by an operator to move

1          MR. POPILOCK:  Right.

2     BY MR. POPILOCK:

3          Q.        Is that why you have this

4     instruction to stay at the control panel, because

5     you know sometimes people would move away from it?

6          A.        I'm telling them how I want my door

7     operated.  I'm not asking them.  I'm telling and

8     in this plaque I'm trying to be safe.

9          Q.        And you are telling them to stay at

10    the control panel because it is safer to remain at

11    the control panel than to stray away from the

12    control panel?

13         A.        Yes.

14         Q.        How much would it have cost Schweiss

15    in 1996 to purchase this safety option of a dead-

16    man controller switch?

17         A.        Roughly $75.

18         Q.        And if I understand it correct,

19    there is no need for a different control panel,

20    it's merely the switching of a wire in the same

21    control panel?

22         A.        I am not sure of the real process.

23         Q.        Are you aware that after Mr.

24    Douglas's accident contact was made between

1   Schweiss and Modern Mushroom concerning the dead-

2   man switch?

3        A.      Yes.

4        Q.      And are you aware that Schweiss made

5   recommendations on how to change the electrical

6   configuration of the controller?

7        A.      Yes.

8        Q.      And that change was to make it from

9   a switch that did not require constant pressure to

10  a switch that did require constant pressure?

11       A.      Yes.

12       Q.      And, in fact, Schweiss faxed

13  information to Modern Mushroom to show them how to

14  do it?

15       A.      Yes.

16       Q.      Do you know whether that information

17  that was faxed from Schweiss to Modern Mushroom

18  depicting how to convert it to a dead-man switch

19  is the same manner that it comes from the factory

20  if someone purchases a door with a dead-man

21  switch?

22            MR. DEVLIN:  John, I'm sorry.  I

23       don't understand that.  Do you mean is it

24       included in the manual that is provided?

293

Q.        Pre-wired.  Okay.

          Is the control box internally also
pre-wired?

     A.        Yes.

     Q.        By whom is it pre-wired?

     A.        Back at our factory.

     Q.        This is pre-wired by your company at
the factory?

     A.        Yes.

     Q.        Did I understand you to say that the
way that your company wires it back at the factory
is that you can push the up button and take your
finger away and the door will continue to run
without anybody continuing to press on any
buttons?

     A.        If you push on the button the door
will go up and you take your finger off it will
continue going up until it hits the top limit.

     Q.        So the way your company pre-wires at
the factory you do not have to continually hold in
the up button with your finger for the door to
continue to operate?

     A.        Correct.

     Q.        When your company installs a door

5

1       Q.     Did you ever consider whether or not

2  the $75 charge would have any influence on whether

3  a customer would or wouldn't order the operation

4  of a dead-man control?

5       A.     No.

6       Q.     Prior to this lawsuit did you or

7  your company ever consider whether or not having a

8  policy of wiring your standard wires as dead-man

9  on the control would increase the safety for the

10  operator?

11      A.     No.

12      Q.     Prior to this accident did you ever

13  consider whether or not having a policy of

14  requiring a pre-wiring of the controls to be in a

15  dead-man continuous pressure operation would

16  increase the potential that there would be a

17  operator standing at the control at all times

18  while the door was in operation?

19      A.     Run that by me again.

20      Q.     Sure.  At the time that your company

21  decided that you were going to send the controls

22  as your standard without it being a dead-man

23  continuous pressure operation did you ever in

24  making that decision consider that if you reversed

1    your decision and had said, "Hey, let's make our

2    standard operation be we ship them out with a

3    dead-man continuous pressure, that that type of

4    policy would have required that there always be

5    somebody standing at the control while the doors

6    were moving up or down?

7         A.    No.

8         Q.    Now, did I understand you to say to

9    Mr. Popilock earlier today that when your company

10   got a call from Modern Mushroom about whether they

11   could change the controls to the door to the

12   continuous pressure dead-man operation that was

13   something that you were able to handle for them

14   without even coming back out here?  You just

15   handled that by sending them a fax?

16        A.    Yes.

17        Q.    And did I understand you to say that

18   you didn't charge them for that information, the

19   fax or any of that work?

20        A.    Did not charge them.

21        Q.    At the time that you got that

22   request from Modern Mushroom about how they could

23   change their controls and if they could change

24   their controls over to a dead-man operation did

314

1          again.

2                    MR. DEVLIN:   That's not what the

3          warning says.

4    BY MR. ABELL:

5          Q.       Does your warning say that the

6    operator should not walk away from the controls

7    while the door is in motion?

8          A.       Right.

9          Q.       Why is it that your company puts

10   that warning?

11         A.       Why?  Because you are moving a large

12   piece of equipment up, it has moving parts on,

13   it's mechanical and for people, pedestrians, dogs,

14   cats, equipment, I want them to be ready and alert

15   to shut it off if something would happen.

16         Q.       So it would be fair to say that the

17   reason is so there is somebody there to stop the

18   motion of the door if for some reason the door

19   motion should be stopped?

20         A.       Correct.

21         Q.       Would you say that that warning was

22   for safety reasons?

23         A.       Yes.

24         Q.       Did you ever consider that an

DIAMOND COURT REPORTING

1    alternative way to address the safety concern

2    about the need to stop a door could be addressed

3    by having a dead-man control which would

4    physically require there be a person standing

5    there?

6                    MR. DEVLIN:  Asked and answered.

7                    Answer it again but this is all

8        stuff Popilock went over.  Mr. Popilock I

9        should say.

10                    THE WITNESS:  Do you want to ask

11        that again?

12   BY MR. ABELL:

13        Q.        Sure.  After you identified that

14   that would be a benefit to having a person

15   standing by the control so that the door could be

16   stopped, that was a safety concern, did you

17   consider having that safety concern addressed by

18   only selling doors where the control is wired as a

19   dead-man operation?

20        A.        No.

21        Q.        Do you believe there are any

22   circumstances in which a single push control, and

23   by that I mean where you can push the control and

24   then take your hand away for it and the door will

317

8    1    control?

2    A.      That's an up-down stop station.

3    Q.      The operation that I just described

4    where a person can push the control, take their

5    finger away and the door will continue to operate,

6    I have called that a single push operation.

7    A.      Okay.

8    Q.      Can you think of any circumstances

9    in which a single push operation would provide

10    more safety than a dead-man operation?

11    A.      No.

12    Q.      I would like to move to the

13    insulation that was on the door.

14    A.      Okay.

15    Q.      Did your company apply the

16    insulation to that door?

17    A.      Yes.

18    Q.      Did your company decide the type of

19    insulation that was going to be applied to the

20    door?

21    A.      We don't decide.  We offer a type.

22    Q.      At the time of the sale to Modern

23    Mushroom what type of insulation did you offer for

24    a door?